15 minutes per side. Ms. Darcy Brault for the appellant. You may proceed. Good morning. May it please the Court, Darcy Brault on behalf of the plaintiff appellant Nua Gjokaj. I understand you've reserved three minutes? Yes. Thank you. Thank you. So a man suffers a partial amputation of his finger in an industrial accident. He later jokes, I used to be able to count to 10, now I can only count to 9 1⁄2. The district court in granting summary judgment for the defendant appellee on all counts of our complaint resolved many factual issues and thereby usurped the function of the jury. I will assume familiarity with the facts of the case, but I want for a moment to concentrate on two fact elements to illustrate the factual disputes in this case. After Mr. Gjokaj's injury, he was seen, he was taken to the hospital, Wyandotte Hospital, by an ambulance that is owned and operated by U.S. Steel, his employer. On the day that he was transported to the hospital, Laura Lieb made 24 calls. Twenty-four calls that evening. Laura Lieb is the director of the plant medical department. She called Steve Kowalczak, who was her supervisor, and she made four calls to James Van Buren, who was the manager of employee relations. Many of those calls were before Mr. Gjokaj ever returned to the plant medical department and ever made any of the representations or indicated that he was disinclined to return to the plant medical the next day. A reasonable juror could conclude that Laura Lieb was consulting employee relations about Mr. Gjokaj before he returned to the plant medical department, consulting with them regarding an employee that she had already labeled as difficult and frustrating in her experience with him related to his earlier back injury. That's an important fact because there is no reason that Laura Lieb had to consult with employee relations about disinclination to return to the plant medical department until after there was an issue with respect to his alleged misrepresentation. The alleged misrepresentation being that he stated that his finger was amputated. Did discovery reveal that the subject of these various calls was your client? Ms. Lieb couldn't recall talking to anybody until we got her those calls. So you know they're calls and so the inference you want a jury to draw is that they must have been talking about your client. Well, I don't think there's any dispute that they were talking about Mr. Gjokaj. I just asked you, did discovery reveal they were talking about your client and you said we don't know. No, initially in her first deposition she had no recollection of any calls. When we confronted in her second deposition she did indicate that she made those calls. You're missing my point I think. What does discovery reveal was the subject of those calls? She stated that she was speaking with the individuals from employee relations about Gjokaj's incident. Also, there's another factual scenario that I think is really important and really contextualizes Ms. Lieb's role Mr. Gjokaj was sent to Dr. Atone and Dr. Atone gave him a piece of paper, documents that said that there was a partial amputation of his finger. And he returned to the plant medical department that night for the sole purpose of providing those documents to the contract nurse that was on duty there. There was no medical doctor and Ms. Lieb was not there at that time of night. She left at 3 o'clock. Mr. Benitez, the nurse, is the one who said that Mr. Gjokaj made this comment or statement about amputation. Mr. Gjokaj's testimony is that the only joke that he ever made about this amputation was the one that I cited in opening. Can only count to nine and a half? Exactly. He was wearing a bag over his hand, right? That was the next day after that and also he was trying to apparently keep anything from getting in there. He had it wrapped. The finger was bandaged. I actually was able to go to the plant medical department and we took pictures of the plant medical department and the cleanliness of the plant medical department was certainly an issue in the case and certainly an issue for Mr. Gjokaj so he did take precautions. What about the fact that your client showed up late both times when he had 7 a.m. appointments for the next two days? Well, they set these 7 a.m. appointments and the first time Mr. Gjokaj had been treated at the hospital and was leaving the plant quite late and he lived 75 miles from the plant and what he asked was that he could see somebody in his neighborhood. He wanted to see a doctor, his own doctor. The reason that the appointments were set up was solely for the purpose of not having any lost time. There was never any treatment ever provided to him at the plant medical department. Didn't they take x-rays when he was amputated? However, I will say that they never took the bandage off. What's a little troublesome is you say the only thing he ever said is 9 1⁄2 fingers. Now, the record indicates at least according to the company he said quite a few other things about this finger and it being amputated. I understand that you dispute that. Second of all you say he came back to the plant and in your briefs and in your argument this morning you say there was no treatment whatsoever. It was all just a cover for making the report that he was at work. But then he got x-rays. There was a reason why he came there. The x-ray was not for the purpose of treatment and there was no one who said that the x-ray was for the purposes of treatment. He had already been to Dr. Atoni who had already treated him for the finger. So why do you think that they did the x-ray? Because they wanted to see if he had 9 1⁄2 fingers. And what was the point of knowing whether he had 9 1⁄2 fingers? Well this is what I want to talk about. It was to determine if he could work. So what on earth is the matter with that? They never said that. That's not part of the record in any way, shape or form. They had already determined. Dr. Atoni had made the day before a recommendation with respect to his ability to work. I believe it was one-handed work. This goes into the second factual scenario that I wanted to highlight. Mr. Benitez, after he sees Mr. Jokaj when he comes back from Dr. Atoni's office and gives him the medical documents, here's what Mr. Jokaj is saying as being that his finger was surgically amputated. Now Mr. Jokaj denies that he ever said it was surgically amputated, but he did of course make other representations about his finger, just not jokes. He did say that his finger was cut off. He did say that his finger was amputated because that's what he was told by the doctor. And he could see that it was cut off. Everybody who saw that finger at the time knew that it was cut off. It was hanging by the skin of the fingertip. They were able to put it back on. You seem to suggest that what he said was technically correct, so he shouldn't suffer any consequences from that. But how does that square with your claim that he was kidding, that he was joking? What did he say then that was untrue but was offered as a joke? We don't know. We can't know what was said specifically between Mr. Jokaj and Mr. Benitez. He was on the claims that he was joking, so what does he say that he said was a joke? Mr. Jokaj says that the only joke that he made was the nine and a half finger joke. He doesn't know what Mr. Benitez was thinking. But we do know this, that Mr. Benitez testified very specifically. People say all kinds of bizarre things about their health. People are not doctors and they don't know medicine. He didn't believe that Mr. Jokaj had had a surgery on his finger. He didn't disbelieve it. He took the words at face value and he called Laura Lieb. He called Laura Lieb and he said, this is what Mr. Jokaj is saying. Interestingly, she expressed surprise and he testified to that credibly twice that when he talked to Laura Lieb, she expressed surprise that Mr. Jokaj had surgery. That is entirely inconsistent with her testimony that she spoke to Mr. Jokaj directly on the phone and he told her that he had his finger surgically amputated. I guess my problem, how does all this tie into your claim of disability discrimination under the Americans with Disabilities Act? Is there any evidence in the record that any absences from not appearing on schedule or misrepresenting their medical conditions was not fired? I mean, is there any comparable non-disabled employee that you can point to? Because that's typically the way you prove discrimination, that hey, my guy was fired when other people who did the same thing that he did continued to be employed. Is there such a person in the record? Well, the activity is allegedly making misrepresentations to the plant medical department about the physical conditions. So there isn't anything that I have in the record of anybody else being treated similarly without a disability. There are, however, many complaints that have been made of discrimination in particular related to accommodations. There were 50 some complaints by employees at U.S. Steel in five years. But the facts that support his ADA claim are these. He was injured. He had this back injury in 2011. And he required an accommodation for that. And the USS was meticulously tracking that condition in these safety meetings that they held weekly. And in those meetings, they talked about his, not only his injury, but the accommodation as well. Of course, maybe that was just because they wanted to be sure he didn't re-injure his back. Well, Ms. Lieb described his back injury as a high-profile case. And high-profile is the exact words that she used. And she also used the words frustrated when she talked about dealing with Mr. Jokai. He also met with resistance from his supervisors who would bait him with respect to his ability. Did he identify these supervisors who made these comments? He could not. But this is a large plant where supervisors rotate constantly. If none of those supervisors were the decision-maker, which was Mr. Simpson, how does that help? That's true. And we don't know that the decision-maker is Mr. Simpson. Our contention is that Laura Lieb was the person who drove this decision. Let me ask you this, though. You're claiming, though, they were discriminating against him because of his 2011 back injury. But isn't it true that about a year later, they accepted him into this 18-month training program to become a, what, a maintenance technician mechanic? That doesn't sound like a company that's trying to get rid of him if they've accepted him to a year-and-a-half training program. Well, Mr. Jokai is a union employee. And he applied for, using the appropriate method under the contract, for a promotion. And essentially, it wasn't really a promotion, but it was a job that was less strenuous compared to the jobs that he was being given. So he actually sought his own position, a vacant position, that could better accommodate him. Right. But they could have said, no, you don't qualify. They could have said, no, he didn't qualify. That's not evidence of discrimination. But you don't even have that, do you? But he did qualify. And under the terms of the contract, that would potentially be a promotion. And he said he was treated reasonably well, wasn't he? And I tried to rebut that in my brief. I think that it's unfair to look at decontextualized statements that a person made. What he said was that he was treated well in terms of his assignments, the job assignments, because he was given assignments that he could do. He was baited while he did them, but he could do them. And I set forth all the facts to which he testified that no person could say, I was reasonably treated. He was put in an ambulance and sent to the hospital for a laminectomy against his will. I don't think that anybody would say that that was reasonable treatment. He had to check himself out of the hospital to avoid having a surgery. And this is a person who has difficulty communicating. And that, I think, was an overreach of high order and also part of Nurse Leib's frustration with him. All right. Thank you. Your light is on. You'll have your rebuttal. Thank you. Good morning, Your Honors. I'm Mark McInerney representing U.S. Steel. Your Honors, this case is an effort by Mr. Jokai to use conjecture and speculation, misdirection and confusion to try to manufacture a case where none exists. To her credit, the district judge maintained focus on the material issues in this case, not all the collateral issues the plaintiff tries to inject into this case, and concluded that none of the four causes of action plaintiff tries to assert can be supported. The district court's very thorough opinion granting summary judgment, we believe, should be affirmed. Just out of curiosity, what was the subject of all those calls before the extent of his injury was known? Judge, I don't remember Ms. Leib remembering that issue. I sat at that deposition, both Leib depositions, and I don't remember that she knew that. Kowalczyk was her boss, so she could have been talking to him about any number of issues. And why she talked to Van Buren, I don't remember that coming up. I don't think it's been briefed, either. So I can't answer your question. Turning to the disability discrimination case, which is where most of the discussion was this morning, we think there's two bases for affirming the district court and dismissing Mr. Jokaj's case. One is the requirement that a plaintiff asserting an ADA case show that his disability was the but-for cause of the discrimination. A number of cases from this circuit, both Judge McKeague and Judge Gilman have been on those cases, making clear that but-for is the proper standard. The plaintiff claims that that standard was changed by the terms of the 2008 amendments to the ADA, but the cases that we've cited were all decided well after the 2008 amendments to the ADA, and the court has continued with the but-for standard as the proper standard in these cases. I'm not even sure that if a court were to decide, and I don't believe any courts have said that the 2008 amendments make any difference, the language changed from because of to on the basis of, and I would say that's the same thing. Now, why Congress changed the words is anybody's guess, but why Congress does anything is anybody's guess. So I don't think that there's a basis to argue that. Under any standard, Mr. Jokaj cannot show that his disability had anything to do with his termination. His evidence is, I just know that's why it happened, that he somehow divines this. In answer to a question from Judge Gilman, Ms. Brault, I believe, admitted that there are no similarly situated employees who were treated differently than Mr. Jokaj. What bothers me a little bit, though, is, you know, he shows up late, but he comes both days on follow-up medical visits. I mean, he doesn't even call them medical visits, but checkups at the plant medical department. And then there's this question of whether he's joking or not about having his finger cut off. And for those three things, he's fired. I mean, it just strikes me that's very harsh. I mean, it's not like he stole money or blew up the plant or went on a rampage with his fellow employees. I mean, it raises the question, you know, one of the standards of how you show pretext is that the reasons given were insufficient to motivate the employer's actions. And why do you think these two, being tardy twice and joking about the status of his finger, justified firing him? I understand the court's question. Before I answer it directly, I point out that that basis of pretext that you just identified has not been addressed by the plaintiff in this case. They have proceeded under the basis that there was no basis in fact. Now, to answer the question, I suspect that if it had just been the two tardy appearances, he would not have been fired. He might have been disciplined. Seven o'clock, by the way, is his starting time. That wasn't some strange time pulled out of the air. That's his normal starting time. It's the time plant medical opens in the morning. And he was brought in for consultation and evaluation. But the key one was lying about having his finger cut off. And I'll tell you why that's an issue for U.S. Steel. His job, this maintenance job he had, didn't have him at a particular place in the plant all the time. He wandered around this huge plant. He was assigned to different places in this huge plant every day. And the company had to take his word for what was wrong, what he did. So his honesty is extremely important in his job, as opposed to somebody who might work in an auto plant and just stays in the same spot every time and puts a door on. You know, his honesty isn't as much of an issue for a person in this gentleman's job. That is very important. And the company takes safety very seriously. And so when somebody comes and lies about having his finger partially cut off surgically, that's taken very seriously by the company. But Dr. Madden actually took his x-ray the very next morning, the first morning after, didn't she? Second morning. Okay, well. He was injured on a Wednesday. I can never remember these dates. But he was injured on a Wednesday. The first day he was there was a Thursday. And Dr. Madden immediately sent him to the hand specialist. I thought she took an x-ray first. No, she took an x-ray the next day when he came back. And there was this question about him telling the nurses the night before that he had had his finger cut off. And so they decided to take an x-ray, which of course showed that everything was in place. And the finger is still in place. I think there are exhibits to our motion for summary that show his hands during his deposition. And everything is there. Supposedly two months later, he's okay. That's right. That's right. And he is suspended and ultimately terminated, but he's still seeing plant medical and treatment by other doctors because he's still an employee while the grievance process goes on. So that's how Dr. Madden on September 13th, which is not quite two months after the accident, says that his finger is fine. There's circulation. The case is closed. What was the union's role in this whole case, if any? The union appeared with Mr. Jokai at each step of the grievance process. The union basically accepted the testimony from the company representatives, particularly Ms. Lieb, about what Mr. Jokai had done or not done, and what he had said or not said, and asked for leniency, basically. Don't fire me. Don't fire this guy. So the union appeared at what's called the 9B hearing, which is a due process hearing to determine exactly what punishment to impose. The step two, which is more or less an appeal of that decision. The step three, which is a further appeal to a higher ranking labor relations representative. And then the union filed an arbitration demand. The case was heading toward arbitration, and then the union withdrew the arbitration demand for reasons that we can only speculate about. Nobody from the union was deposed in the case. So that is the union's role in this. I asked Mr. Jokai if he had considered suing his union. At some point, he said no. I asked him a deposition, I should say. What's the significance, if any, in terms of the ultimate decision by the company of the union essentially, as you claim at least, conceding that he had lied to the company? Well I think it's important in showing, and this is the second argument under the disability discrimination claim, the claim of pretext is that there was no basis in fact for the termination to terminate. And the company's position is that even if for the sake of argument he didn't say these things, the decision makers had the honest belief that he did, based on written statements from the nurses, three different nurses heard him say this. And also Mr. Jokai's non-denial during the 9B hearing and his union's implicit admission of that. So I think what it shows is... When was the decision to fire him final? I'm sorry? When was the decision to fire him final, before or after this union admission? It was, the 9B hearing is when the decision is made to fire him. And it's at that 9B hearing, that's the exhibit that's being challenged in this case. That's when the non-denials take place. The union, later on, says the same thing in subsequent hearings. But the decision is made after the 9B, then there's two steps of appeal in which it's affirmed. So when it was final, I suppose it's not final until they withdrew the arbitration demand and there was no further step in the grievance process. But they don't announce the penalty for this is termination until after what you described as the 9B due process hearing? Yes, sir. Thank you. So the honest belief rule, and counsel disputes that the honest belief rule is still good law. This court has, on a number of occasions, said that it is. The principal case we cite is the Lloyd case from 2014 written by Judge Gilman. That's before we knew you were on the panel, Judge. That makes very clear that the honest belief rule is the rule of this circuit. Counsel suggests that the Staub case from the Supreme Court in 2011 undercuts that. That's not consistent with this court on at least four occasions that I've found since 2011 reaffirming that the honest belief rule is the rule, is the standard in this circuit. It also, the Staub case is completely different because there was lots of evidence of animus by the, I can't remember if it's a decision maker or a person, I think it was a person who made the recommendation for a discharge. And in this case, although there's a lot of conjecture, there's absolutely no evidence that Ms. Lieb had any animus toward Mr. Jokaj. The fact that she said and did things that he doesn't now agree with doesn't mean that she had animus toward him. And certainly not because of his disability or because he might be filing a worker's compensation claim. There was a question of Ms. Brault about the treatment of Mr. Jokaj after his back injury two years before his finger injury. And she kind of tried to soft pedal how he was treated. In the complaint in this case, the plaintiff acknowledged that he was treated properly, he was accommodated, he was given restricted work to do because he couldn't lift anything, he couldn't bend in the first, I believe it's eight months after his back injury. So he was sent to a training center that's on the plant, just down the street from the plant, and did sedentary work for something like eight months until his condition improved and he was able to take on this job, this maintenance job that he had. So I think the idea that the honest belief rule is no longer the law of this circuit is incorrect. So we've got two bases on the discrimination claim. The but-for, the failure to show causation under the but-for standard and the inability to show pretext because of the honest belief rule. We didn't talk too much about the worker's compensation claim. In order to establish such a claim, there must be a showing that the plaintiff made claims that for rights afforded under the Act. And the primary claim that he makes is the ability to get treatment from someone else, from his own doctor, doctor of his own choosing. Well, the Act makes very clear that an employee does not have the right under the Act to do so for the first 28 days after the injury. That doesn't mean that the employee can't on his own dime go see another doctor. But it's, such treatment is not instead of, it might be in addition to treatment by the company. He claims there was no treatment ever at the plant medical department. He did make that claim, your honor, and he's not right. Treatment is a lot of different things. In this case, he was evaluated. When he finally showed up the day after the injury at noon, Dr. Madden looked at the records, talked to Jokai, and immediately recognized that he needed to see a hand specialist. So she sent him to this Dr. Rotoni, who's an independent hand specialist nearby. That's treatment. Whether she unwrapped his finger or not, sending him there is an evaluation under the Act that that's sufficient. The day afterwards when he was called back, as we've discussed, there were x-rays taken and further discussion of his condition. But he was cleared for work by both Dr. Madden and Dr. Rotoni. Restricted work, certainly. One-armed or one-handed work, is a better way to put it. Almost from the start. And that gets us into the FMLA case. I see my red hand. Ms. Brault? Very quickly, I would like to address the honest belief rule. The honest belief rule in the context of the Rehabilitation Act was first applied by the Sixth Circuit in the Pesterfield case. The rule applies by, once an employer meets its burden of production to show legitimate nondiscriminatory reason, then the burden shifts to the employee to show pretext. And the pretext can be shown by preferred reasons have no basis in fact, that they didn't actually motivate the discharge, or that the preferred reasons were insufficient to motivate the discharge. And we believe that we have shown facts that bear directly on the pretext issue. The honest belief rule is, in effect, one last opportunity for the employer to prevail on summary judgment. The employer can rebut evidence of pretext by showing that its actions, while perhaps mistaken, foolish, trivial, or baseless, were not taken with discriminatory intent. In order to rebut that rule, I'm sorry, what the employer has to show in order to invoke that rule, is that it reasonably relied on particularized facts that were before it at the time that the adverse decision was made. The employee can present evidence that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action. Some examples, where the decision is based on one conversation with one witness, in the Shazor case of the Sixth Circuit in 2014. A decision being made without hearing the plaintiff's side of the story. A biased, one-sided investigation. Obvious, conflicting witness statements. Key witnesses not being interviewed, or failure to conduct investigation. This brings me back to the point that I spoke of with respect to Mr. Benitez's statement. He contacted Laura Lieb and told Laura Lieb what he believed the representation was that Mr. Jokai made about his finger being amputated. Laura Lieb did not call Dr. Atone. Laura Lieb called employee relations and began the disciplinary process. There was no investigation whatsoever to determine whether or not what Mr. Benitez was saying, which he did not believe, and he did not credibly think that Dr. Atone would have conducted an amputation the day after this injury. None of that points to an honest belief that Mr. Jokai had committed some violation. When we get to the grievance process, which again I want to stress what I said in my brief, that this was a union employer process designed to try to resolve the issue of discharge or discipline. And the conversations that go back and forth as a matter of policy are ones of compromise. During that process, it's important to know that Jennifer Hickey, the only person who can testify in front of the employer about what happened because Mr. Simpson is deceased, Jennifer Hickey said she understood that his finger had not been amputated and that the alleged misrepresentation that was being made was that he said that the finger was cut off, but it was not cut off. She didn't even know that Dr. Atone had made this partial amputation diagnosis. She also said that they did not rehash the facts at the time that she was involved in these meetings, that it was all about whether or not Mr. Jokai showed remorse. And to the extent that the union said Mr. Jokai jokes around a lot, that's true, Mr. Jokai jokes around a lot, but it doesn't mean that he did something that deserved termination. And I also just want to say that if you read those notes and determine that they are admissible as hearsay, you will never see the word surgical amputation because that was never floated as a subject of his misrepresentation until this litigation. All right, thank you. Thank you very much. Case will be submitted.